(No. 5068-

HAZEL ROBINSON, Executrix of the Estate of LAWRENCE ROBINSON, Deceased, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 29, 1965.*

DONALD R. MITCHELL, Attorney for Claimant.

WILLIAM G. CLARK, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

PERLIN, C.J.

Claimant asks damages of $25,000.00 for the death of her husband, Lawrence Robinson, on July 14, 1962, when he was allegedly shot and killed by Cecil Burns, a patient at the Anna State Hospital, a mental institution, owned and operated by respondent at Anna, Illinois.

To recover, claimant must prove by a preponderance of the evidence (1) that Lawrence Robinson used due care for his own safety; (2) that Cecil Burns killed Lawrence Robinson; and, (3) that respondent was negligent in failing to prevent the escape of Cecil Burns from the Anna State Hospital to which he was committed.

That Cecil Burns, an inmate of Anna State Hospital, escaped through the window of his dormitory on the night

of July 13, 1962 about 10:00 P.M., and was absent until captured by police about 7:00 A.M. on Sunday, July 15, 1962, is undisputed.

Claimant Hazel Robinson, wife of the deceased, testified that Lawrence Robinson left his home on Saturday, July 14, 1962, at approximately 7:30 A.M. to work on his farm. He never returned. She stated that he kept a 12 gauge double-barreled shotgun at the farm, and was the kind of man, who would strive to guard his life and safety.

John Paul Davis, State's Attorney of Union County, testified that he, with other law enforcement officers, investigated the death of Robinson.

Cecil Burns was arrested and interrogated in the office of the State's Attorney on Sunday, July 14th. Burns was then taken to the scene of the homicide, where the Sheriff of Union County took off Burns' shoes, and fitted them into footprints at the Robinson farm. Burns thereupon volunteered to make a statement, which included the following information: He climbed out of a window at the Anna State Institution after dark on Friday, July 13, about 9:30 P.M. He stayed in the woods, and then left about 5:30 the next morning. He found an empty house, where he stole a rifle and a number of dimes. He walked along Illinois Highway No. 146 toward Vienna, and stopped at a home where he asked for coffee. He then walked along the highway, and approached Lawrence Robinson's house.

Robinson was in the garden. Burns jumped over the fence, and he and Robinson sat and talked about the idea of Robinson getting a dog. Robinson then went back to plowing, and Burns left, and walked toward the highway. Burns then saw Robinson's truck, and decided to take it to go to Paducah. So, "I went around the house, and picked up his shotgun. He started around the truck, and I shot him." This was about 11:00 or 12:00 o'clock. Burns then went to

Paducah in the truck, and stayed in it all night. He returned to Illinois the next day in the same truck. He purchased a can of paint to use over the letters "L. Robinson" on the truck.

Burns' statement was witnessed by six persons.

Claude M. Stearns testified that he was the Sheriff of Union County at the time in question, and, in such capacity, investigated the death of Lawrence Robinson. He was notified of the occurrence about 8:30 P.M. on July 14th, and arrived on the scene of the slaying about 9:00 o'clock. Footprints were found in the area, and guarded until they could be examined by daylight.

About 9:30 P.M. it was ascertained that Cecil Burns had escaped from the Anna State Hospital; that a man answering his description had asked for a cup of coffee from Elijah Davis, who lived three-quarters of a mile from the Robinson farm; that he was carrying a 22 rifle; and, that he had then proceeded toward the Robinson farm.

The sheriff determined that the shooting occurred about 11:30 or 12:00 o'clock on Saturday, July 14, 1962. There was also a report of a break-in at the house of Winstead Tucker, which was located just west of the Elijah Davis' farm. He reported that a large number of dimes and a 22 caliber rifle were missing. After Cecil Burns was apprehended, the sheriff learned that Burns had purchased paint at a store in Paducah, Kentucky, and had paid for it with dimes. When the pickup truck was recovered, it was discovered that the name L. Robinson had been painted out with black paint. The sheriff found the can of paint and brush behind the seat. Burns was taken to the scene of the shooting. The sheriff asked Burns to give him one of his shoes, which he then fit into the footprint in the freshly plowed garden of the Robinson farm. The sheriff stated that it was an oxford type high heel, like that found on a cowboy shoe, and fit

the tracks perfectly. Afterwards Burns said he would like to "tell us about the whole thing." The sheriff then returned Burns to the State's Attorney's office where he gave his statement of confession to the murder. The statement was verified by the sheriff's investigation.

Earl Wade, sergeant of the Cairo Police Department, and Fred Stilley, an Illinois State Police Trooper, testified that they participated in the chase and apprehension of Cecil Burns. Wade stated that the chase began when he received a call from the Cairo Police that a stolen truck belonging to Mr. Robinson had been sighted. He and Trooper Stilley chased the truck at speeds up to 105 miles per hour. The driver tried to force Wade off the highway, and in so doing turned the truck over. The driver resisted arrest by pointing a shotgun at Wade, but was eventually forced to drop his gun by Trooper Stilley, who was covering him from a high rock ledge. The driver of the truck was Cecil Burns. The truck, which Burns was driving, belonged to Lawrence Robinson. The shotgun Burns used was a 12 gauge, loaded, double barreled L. C. Smith.

The Court concludes from the foregoing evidence that Cecil Burns shot and killed Lawrence Robinson after escaping from the Anna State Hospital.

The next question to be determined is whether respondent was negligent in permitting Cecil Burns to escape and inflict injury.

The following data concerning Cecil Burns was revealed:

1. October 2, 1941, in the County Court of Massac County, Illinois, Burns pleaded guilty to assault and battery upon his wife.

2. June 8, 1946, he became a voluntary patient at the Anna State Hospital.

3. July 23, 1946, he was discharged.

4. November 19, 1952, the Medical Commission of Massac County filed a report recommending that Cecil Burns be sent to the Security Hospital at Chester, Illinois. Its findings were: "No. 1, Cerebral Syphilis; No. 2, Multiple Sclerosis; No. 3, Persecution Complex; No. 4, Homicidal Tendencies, cut mother's throat."

5. November 20, 1952, Burns was committed by the County Court of Massac County to the Illinois Security Hospital at Menard, Illinois.

6. January 14, 1953, he was indicted by the Grand Jury of Massac County for the crime of assault with intent to murder his mother. The policeman, who worked on the case, testified that Burns had cut his mother's throat, and had then left her in a critical condition.

7. September 27, 1954, Burns was transferred from the Illinois Security Hospital to the Anna State Hospital.

8. March 23, 1955, he was discharged from the Anna State Hospital.

9. October 24, 1955, Burns was committed by the County Court of Massac County, Illinois to the Anna State Hospital.

10. November 12, 1955, Burns escaped from the Anna State Hospital, and was returned on January 27, 1956. During this time he pleaded guilty to burglary of a business place in Springfield, Ohio, while on escape.

11. September 6, 1956, he was discharged from the Anna State Hospital.

12. In November, 1956, the Superintendent of Anna State Hospital received a letter from the State's Attorney advising that Cecil Burns had committed sodomy. The Superintendent testified that someone in the hospital had

put a notation on the bottom of the letter saying: "Maybe we should send him to security?"

13. November 21, 1956, Burns was committed by the Massac County Court to the Anna State Hospital.

14. September 23, 1957, Cecil Burns and two other patients plotted to break out of the maximum security ward.

15. September 8, 1958, annual patient survey indicates that Burns is a constant escapee, judgment is poor, and he should be kept hospitalized because of his past history of aggressiveness.

16. June 11, 1958, Burns escaped, and was returned on July 15, 1958.

17. May 11, 1959, he escaped, and was captured by the Illinois State Police. Burns escaped from the police, but was eventually recaptured.

18. February 14, 1962, Burns offered money to female patient for cooperation in sexual activity. He was placed in maximum security until March 2, 1962, and was then transferred to the Veteran's Building.

19. In April, 1962, Burns escaped from the Veteran's Building, and stole a knife and drill from a barn. He assaulted and injured an employee, who found and returned him. The report states that the patient became combative, restless and disturbed, and he was thereafter placed in maximum security. He was returned from the maximum security ward on July 5, 1962 with a statement that "he should be in locked ward, but does not need maximum security, and should not be given a grounds' pass."

20. July 13, 1962, Burns pushed out an insect screen in the Veteran's Building, and escaped to commit homicide.

The Deputy Sheriff of Union County testified that he

had returned Cecil Burns from the City of Anna to the hospital about three or four times in the previous two years.

Wayne Isaacs, Assistant Superintendent at the hospital, testified that, when Cecil Burns escaped, he escaped deliberately, and was not the type of patient just to wander around the grounds.

Dr. Robert C. Steck, the Superintendent at Anna State Hospital, described the different ward classifications as follows: (1) Maximum security ward, which is kept locked, has detention security screens set in a metal frame, and has more employees than on a lesser security ward. (2) Security wards, which are locked with ordinary insect screens. (3) Open wards. The Veteran's Building is a locked ward with ordinary insect screens. The Veteran's Building, from which Burns made his escape on July 13, 1962, consists of a center room with two dormitories on either end, which house 50 patients each, and have two attendants. If the attendant left the ward, according to Dr. Steck, a patient could push out a screen, and go out the window. There is no fence around the hospital grounds to prevent a patient from walking away from the hospital.

The evidence further revealed that the escape of Burns was discovered at 10:05 P.M., but the Illinois State Police were not notified until 11:30 P.M. The Assistant Superintendent described the procedure concerning an escape as follows: The psychiatric aide, who first notices a patient missing, notifies his supervisor; the supervisor notifies the nurse in charge of the specific area; then the nurse notifies either the Superintendent or one of the two Assistant Superintendents. The Assistant Superintendent said that he was notified by the nurse shortly after 10:00 P.M., and told her to notify the authorities.

The attendants on duty in the Veteran's Building testified that they were cleaning up the dining room in the

center section of the building when Burns escaped. There were no attendants in the dormitory. Most of the dormitory windows were raised, and not locked. One of the witnesses testified that the screens could easily be removed, and that the windows were close to the ground. He said: "I don't know why they kept the doors locked, and not the windows." Burns' escape was discovered about 10:00 P.M. during a bed check.

This Court has long held that it is the duty of respondent to exercise reasonable care in restraining and controlling dangerous insane persons committed to its custody, so that they will not have the opportunity to inflict a foreseeable injury upon others. *Malloy* vs. *State of Illinois*, 18 C.C.R. 137; *Callbeck* vs. *State of Illinois*, 22 C.C.R. 722; *Redebaugh* vs. *State of Illinois*, 22 C.C.R. 306; *Clifton* vs. *State of Illinois*, No. 5076.

The profile of Cecil Burns, which is detailed in his history, clearly indicates that Cecil Burns was a ruthless, dangerous man, whose constant escapes would preclude keeping him in a place, where he might easily push out an ordinary insect screen, and walk away undetected from unfenced grounds. There was a recent warning of his violent propensities in the fact that not less than eleven weeks before the homicide of Lawrence Robinson, Burns not only escaped, but also stole a knife and drill, and injured an institution employee after attacking him. His entire history would certainly suggest that "reasonable care" be substantially more than was manifested in the instant case. If he was to be kept in a locked ward, as prescribed, the windows should at least have been locked, or should have been equipped with security screens, as were used in other sections of the institution. Minimum standards of reasonable care were violated in this case. It is the conclusion of the Court that respondent was negligent in taking no pre-

cautions to prevent a reasonably anticipated escape of a dangerous inmate.

Claimant presented further evidence to show that she was wholly dependent upon her husband for support; that he had, at 51, a life expectancy of 22 years; and, that his income as an employee of the Vogler Motor Company averaged from $5,000.00 to over $6,000.00 per year for the years of 1957 through 1961.

It is the opinion of this Court that claimant be awarded the sum of $25,000.00.